## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| RISER FOODS COMPANY, a Delaware corporation, | ) ) ) | CIVIL ACTION NO. _____ |
| Plaintiff, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) ) | |
| SHOREGATE PROPERTIES, LTD., an Ohio limited liability company, | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiff, Riser Foods Company, hereby files the following Complaint against defendant, Shoregate Properties, Ltd. ("Shoregate"), and in support thereof, avers as follows:

### I. INTRODUCTION

1.     On October, 12, 2004, Riser Foods Company (referred to herein as "Giant Eagle" or "Tenant") entered into an Amended and Restated Lease Agreement (the "Lease") with Shoregate Shopping Center, Ltd. ("Landlord") in connection with an $11 million renovation and expansion of the Giant Eagle store at the Shoregate Shopping Center, Willowick, Lake County, Ohio.

2.     Pursuant to the deal reached by the parties, Giant Eagle was required to pay a fixed annual rent to Landlord, plus annual percentage rent if 1% of its annual sales exceeded credits for the fixed rent payment and other payments made by Tenant in connection with the Lease. The amount of annual sales necessary to trigger the percentage rent obligation is commonly referred to in the industry as the "breakpoint," and only sales above the breakpoint are subject to percentage rent.

3.      During the first three years of the Lease, November 1, 2004 through October 31, 2007, 1% of Giant Eagle's annual sales were less than the applicable credits (stated another way, the annual sales were less than the breakpoint) and, therefore, Giant Eagle did not pay any percentage rent to Landlord.  Landlord never objected to Giant Eagle's percentage rent calculations and never declared Giant Eagle to be in default of the Lease for failing to pay percentage rent.

4.      In May 2008, Landlord assigned the Lease to defendant Shoregate in connection with Shoregate's purchase of the Shopping Center.  During its due diligence, Shoregate was made aware that the agreed upon percentage rent breakpoint between the parties was $124,408,884.  Nevertheless, when Giant Eagle submitted to Shoregate its annual sales report showing that no percentage rent was due for the 2008 Lease year, Shoregate claimed that Giant Eagle's calculation of the breakpoint was erroneous and that Giant Eagle owed over $1 million in percentage rent during the first four years of the Lease.  In doing so, Shoregate seeks to apply an interpretation of the Lease that is contrary to the intent of the original parties to the Lease – an intent of which Shoregate was aware when it purchased the Shopping Center – in an attempt to wrongly extract millions of dollars in percentage rent from Giant Eagle.

5.      To counter Shoregate's bad faith conduct, Giant Eagle has been forced to file this action to seek a judgment from the Court declaring that the percentage rent provision in the Lease, as properly interpreted and applied, requires Giant Eagle to pay annual percentage rent only when its annual sales exceed the breakpoint of $124,408,884.  In the alternative, and in the event the Court does not deem the language in the Lease to comport with the clear intent of the contracting parties, Giant Eagle requests that the Court reform the Lease to properly reflect that intent and to prevent a grave injustice.

2

## II. PARTIES

6.     Plaintiff, Riser Foods Company, is a Delaware corporation with its principal place of business located at 101 Kappa Drive, Pittsburgh, PA 15238. Riser Foods is a wholly-owned and controlled subsidiary of Giant Eagle, Inc.

7.     Defendant, Shoregate Properties, Ltd., is an Ohio limited liability company with its principal place of business located at 2101 Richmond Road, Beachwood, Ohio 44122.

## III. JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

9.     Venue in this district is proper under 28 U.S.C. §1391 because defendant resides and has committed the acts complained of in this district.

## IV. MATERIAL FACTS

A.     Percentage Rent Provisions In Grocery Supermarket Leases

10.     Percentage rent provisions are commonly found in retail lease agreements, including grocery supermarket leases.

11.     The standard formula in the industry applicable to percentage rent provisions in grocery supermarket leases requires a tenant to pay a 1% percentage rent on any annual sales that are in excess of what is commonly called a "breakpoint," which is most often determined by taking 1% of annual sales less credits for fixed rental payments and, possibly, for other amounts paid by the tenant under a lease agreement. The tenant is required to pay 1% percentage rent only on those sales that exceed the breakpoint.

3

12.     The percentage rent provision most often takes one of two forms.  In many grocery store leases, the breakpoint is expressly set forth in the percentage rent provision.  The breakpoint is typically determined, or based primarily upon, standard formula in the industry or some variation thereof, although in some instances it may be negotiated at arms length.

13.     In other grocery store leases, the percentage rent provision sets forth the applicable formula for determining the percentage rent obligation, including the credits to be offset against the sales.  Although these leases may or may not expressly include the term "breakpoint," the formula provided in the lease enables the parties to calculate the applicable breakpoint for lease administration purposes.

B.      The Original Lease

14.     By Lease dated August 26, 1977 (the "Original Lease'), Reider Shoregate Stop-N-Shop Supermarkets, Inc. (Giant Eagle's predecessor-in-interest under the Original Lease) leased space at the Shoregate Shopping Center from Albert B. Ratner, Trustee (Landlord's predecessor-in-interest under the Original Lease).  Reider and then Giant Eagle continuously operated a supermarket at the Shopping Center during the term of the Original Lease.

15.     The Original Lease had provisions for the payment of fixed rent and percentage rent.  The annual fixed rent for the 20-year term was $95,000.  The breakpoint for percentage rent was expressly set forth in the Original Lease at $9.5 million during the first 10 years of the Lease.

16.     The breakpoint of $9.5 million was consistent with the industry standard as it is mathematically equivalent to 1% of annual sales less a credit for the fixed rent payment of

$95,000 (1% of $9.5 million less $95,000 equals $0). Tenant was required to pay 1% of any gross sales in excess of $9.5 million as percentage rent.

17.     In August 1987, the parties amended the Original Lease to extend the initial 20-year term of the Original Lease to January 31, 2007 and to grant Tenant 3 5-year options that could have extended the term to January 31, 2022. In addition, both the fixed rent and percentage rent provisions were amended. The fixed minimum rent was increased to $232,713. The percentage rent breakpoint was increased to $23.5 million (apparently rounded up from the $23.3 million called for by the breakpoint formula). Thus, Tenant was required to pay as percentage rent 1% of any gross sales exceeding $23.5 million.

18.     The Original Lease also called for a decrease in the fixed rent to $214,461 if a "major construction" of a primary roadway leading to the Shopping Center occurred during the period from 1987 through 1990. Correspondingly, if a major reconstruction occurred, the percentage rent breakpoint was also to be reduced to $21.5 million (again, apparently rounded up from the $21.4 million called for by the standard breakpoint formula).

C.     <u>Giant Eagle and Landlord Enter Into Amended and Restated Lease</u>

19.     In or around 2003, Giant Eagle and Landlord began discussions regarding the possible expansion and extensive renovation of the existing Giant Eagle store, as well as the addition of a fuel station to the Shopping Center.

20.     The parties eventually agreed to expansion and renovation plans, with Giant Eagle to be solely responsible for all costs related to the expansion/renovation (the "Project Costs").

21.     In culmination of their agreement, the parties entered into an Amended and Restated Lease Agreement dated October 12, 2004 (the "Lease," attached hereto as Exhibit A).

22.     The Lease provided for an initial term of 20 years, as well as 6 5-year options, thus creating a potentially 50-year Lease term.

23.     It was agreed that during the original term of the Lease, Giant Eagle would continue to pay the same annual fixed minimum rent as it had been paying under the Original Lease, or $232,713. For each of the 6 option years, however, the rent was increased so that during the final option period, the annual fixed minimum rent would be $328,960.

24.     The parties also agreed to revise the formula for determining the breakpoint for percentage rent. The revised formula was intended to ***substantially increase*** the breakpoint during the initial 20 year Lease term so as to allow Giant Eagle to annually recapture a portion of its amortized Project Costs before it would be required to pay percentage rent.

25.     Because, at the time the parties entered into the Lease, the total amount of the Project Costs was unknown, the parties were unable to determine the precise credit applicable to the Lease and, therefore, unlike in the Original Lease and its 1987 amendment, the actual breakpoint was not expressly set forth in the Lease. Rather, the Lease sets forth the formula to be used to calculate percentage rent, including the applicable credits.

26.     Article I, Section I of the Lease is the percentage rent provision and it provides as follows:

> One percent (1%) of Adjusted Gross Sales, which Adjusted Gross
> Sales shall be reduced by the sum of (i) Base Rent for that Lease
> Year and (ii) the amortized amount of Tenant's Project Costs, with

interest at the rate of 6.5% per year over the term of twenty (20) years. The term "Project Costs" shall mean all costs associated with Tenant's remodel of the Premises and initial build-out of the Expansion Area. It is anticipated that the Project Costs shall be approximately Eight Million One Hundred Thousand and No/100 ($8,100,000.00).

27.     Although it was estimated that Giant Eagle's Project Costs would be $8,100,000, its actual Project Costs equaled $11,304,232.00. Accordingly, based upon the formula agreed to by the parties, the credit for percentage rent (or, stated another way, the applicable breakpoint) during the first 20-years of the Lease is $124,408,884 (1% of $124,408,884 less credits of $232,713 (fixed annual rent) and $1,011,376 (Projects Costs amortized over 20 years at 6.5% interest) equals $0).

D.     Giant Eagle's Percentage Sales Reports for the First Three Lease Years

28.     Pursuant to the Lease, Giant Eagle is required to provide a certified gross sales statement to Landlord within sixty (60) days of the end of each Lease year.

29.     At the end of the first Lease year, November 1, 2004 through October 31, 2005, Giant Eagle provided Landlord a gross sales statement that showed that Giant Eagle owed no percentage rent for the period. A true and correct copy of the 2005 gross sales statement, which has been redacted to protect from public disclosure confidential sales information, is attached hereto as Exhibit B (the "2005 Statement").

30.     The 2005 Statement reported that no percentage sales were due because Giant Eagle's sales were below the applicable breakpoint based upon the percentage rent formula agreed upon by the parties. Although the renovation/expansion had not yet been completed at this time, and therefore the final breakpoint could not be calculated, Giant Eagle was able to

determine that the breakpoint would be no less than $86,689,200 based on construction costs [i.e., Project Costs] to date of $7,088,273.46." (brackets supplied).

31.    Landlord did not object to the 2005 Statement nor did it at any time contest Giant Eagle's calculation of the breakpoint or its determination that no percentage rent was due.

32.    Following the Lease year ending October 31, 2006, Giant Eagle again sent Landlord a gross sales statement (the "2006 Statement," a redacted copy of which is attached hereto as Exhibit C).

33.    Because all construction was completed by this time, the 2006 Statement included a cover letter informing Landlord that the final percentage rent breakpoint for the initial 20-year term of the Lease was $124,408,884 based upon final Project Costs of $11,304,232.

34.    The 2006 Statement showed that total sales for the year were again well below the established breakpoint, and that no percentage rent was due.

35.    Again, Landlord did not object to the 2006 Statement nor did it at any time contest Giant Eagle's calculation of the breakpoint or its determination that no percentage rent was due.

36.    At the end of the third Lease year, November 1, 2006 through October 31, 2007, Giant Eagle sent a gross sales statement for the year to Landlord (the "2007 Statement, a redacted copy of which is attached hereto as Exhibit D).  The 2007 Statement again stated that the breakpoint was $124,408,884 and that, because Giant Eagle's sales for the period were less than the breakpoint, no percentage rent was due.

37.     As in the prior two years, Landlord did not object to the 2007 Statement nor did it at any time contest Giant Eagle's calculation of the breakpoint or its determination that no percentage rent was due.

E.     Assignment of Lease to Defendant Shoregate

38.     In or around May 2007, Landlord and Shoregate entered into a Purchase Agreement pursuant to which Landlord sold the Shopping Center to Shoregate.

39.     Approximately one year later, in May 2008, Landlord assigned the Lease to Shoregate.

40.     Upon information and belief, Shoregate engaged in due diligence with respect to the Shopping Center and Landlord provided Shoregate with access to all rental information regarding the Lease, including the 2005, 2006 and 2007 Statements.

41.     Because Giant Eagle is one of the major anchor tenants at the Shopping Center, the rental stream received from the Giant Eagle Lease is a major asset of the Shopping Center and would have been of considerable importance to Shoregate (in formulating a monetary offer for the Shopping Center) as well as to Shoregate's lenders.

42.     Upon information and belief, Shoregate knew, or was provided access to information from which it reasonably should have known, that Giant Eagle had calculated the percentage rent breakpoint to be $124,408,884 and that Landlord had agreed with Giant Eagle's calculation or, at the very least, had not objected to it.

E.   Shoregate Declares Giant Eagle to be in Default of Lease

43.   Because Shoregate had assumed all rights and obligations of Landlord under the Lease by the end fourth Lease year, Giant Eagle sent the gross sales statement for the November 1, 2007 through October 31, 2008 period (the "2008 Statement," a redacted copy of which is attached hereto as Exhibit E) to Shoregate. The 2008 Statement was in the same format as the previous Statements provided to Landlord and provided the same information, including the fact that the applicable breakpoint was $124,408,884.

44.   Giant Eagle's sales for the 2008 Lease year were below the breakpoint and, therefore, Giant Eagle declared that no percentage rent was due.

45.   By letter dated February 2, 2009 (attached hereto as Exhibit F), Shoregate objected to the 2008 Statement and claimed that Giant Eagle owed $313,786.50 in percentage rent for the 2008 Lease year. Shoregate also claimed that Giant Eagle owed percentage rent of nearly $700,000 for the previous years 2005 through 2007.

46.   In the February 2009 letter, Shoregate also claimed, for the first time, that Giant Eagle had "incorrectly" calculated the breakpoint. Incredibly, Shoregate asserted that the proper formula for determining percentage rent for the initial term of the Lease is one that results in a mathematically equivalent breakpoint of only $1,244,489. Thus, Shoregate is claiming that, contrary to the intent of Giant Eagle and Landlord to *substantially increase* the breakpoint to allow Giant Eagle to recapture the Project Costs, the contracting parties agreed to *substantially reduce* the percentage rent breakpoint when it entered into the Lease.

47.   Stated another way, Shoregate is asserting that Giant Eagle, by entering into the Lease, not only agreed to fully absorb the costs of the $11 million expansion of its store, but also

10

to pay approximately double the rental costs that it would have paid under the Original Lease, which could have run through 2022.

48.     Shoregate is an experienced shopping mall owner/developer and is aware (and was aware at the time it purchased the Shopping Center) that its formula for determining percentage rent is completely unreasonable, is not in accordance with the common and longstanding practice in the industry, and is contrary to the intent of the original parties to the Lease.

49.     Despite this knowledge, Shoregate has declared that Giant Eagle is in default of the Lease for failing to pay percentage rent and is seeking to wrongly extract millions of dollars from Giant Eagle that the contracting parties never intended Giant Eagle to pay.  See Exhibit F.

## COUNT I
### (Declaratory Judgment)

50.     Giant Eagle incorporates each of the averments of the preceding paragraphs as if fully set forth herein.

51.     Pursuant to the Lease, the agreed upon formula for determining percentage rent during the initial 20-year term of the Lease produces a mathematically equivalent breakpoint of $124, 408,884.

52.     In breach of the Lease, Shoregate wrongly contends that the Lease requires Giant Eagle to pay percentage rent based upon a formula that is at odds with the custom in the industry and the known intention of the contracting parties, and that produces a mathematically equivalent breakpoint of only $1,244,489.

11

53.     There is a case and controversy between the parties that is ripe for resolution.

WHEREFORE, plaintiff Riser Foods Company respectfully requests that the Court enter judgment in its favor and against defendant Shoregate Shopping Center, Ltd. on Count I of the Complaint and declare that: (i) the proper formula for determining percentage rent during the initial 20-year term of the Lease produces a mathematically equivalent breakpoint of $124,408,884; (ii) Giant Eagle owes no percentage rent to Shoregate for the Lease years 2005, 2006, 2007 and 2008, and (iii) Giant Eagle is not in default of the Lease.  Giant Eagle further requests that the Court grant to Giant Eagle its costs of suit, including its reasonable attorney's fees, and such other relief as the Court deems just.

## COUNT II
### (Reformation)

54.     Giant Eagle incorporates each of the averments of the preceding paragraphs as if fully set forth herein.

55.     Giant Eagle and Landlord agreed on a percentage rent formula that resulted in a mathematically equivalent percentage rent breakpoint equaling $124,408,884.

56.     To the extent that the Lease does not accurately reflect the contracting parties' agreement, it is the result of a mutual mistake between the parties and/or a scrivener's error.

57.     Equity and the interests of justice favor the reformation of the Lease to correct the mutual mistake and to accurately reflect the intent of the contracting parties thereto.

58.     At the time it purchased the Shopping Center and also at the time that it was assigned the Lease, Shoregate was aware of, or was provided sufficient information from which

12

it reasonably should have been aware, of the mutual mistake between the parties and that the Lease did not accurately reflect the contracting parties' agreement, the standard in the industry, and the parties' course of conduct.

59.     As a result, Shoregate is not an innocent good faith purchaser/assignee without notice of the mutual mistake and is subject to a reformation of the Lease.

WHEREFORE, plaintiff Riser Foods Company respectfully requests that the Court grant judgment in its favor and against defendant Shoregate Shopping Center, Ltd. on Count II of the Complaint and enter an order reforming the Lease to correct the mutual mistake of the parties and to reflect the intent of the contracting parties to the Lease.  Giant Eagle further requests that the Court grant to Giant Eagle its costs of suit, including its reasonable attorney's fees, and such other relief as the Court deems just.

MARCUS & SHAPIRA, LLP

Dated: March 4, 2009

 */s/ Patricia W. Henk*
Patricia W. Henk (0078641)
Marcus & Shapira LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA 15219
412-471-3490
henk@marcus-shapira.com

Counsel for Plaintiff,
Riser Foods Company

13