IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RISER FOODS COMPANY, | ) | CASE NO. 1:09 CV 489 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| v. | ) | |
| | ) | |
| SHOREGATE PROPERTIES, LLC, | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

## Introduction

Before me[1] are cross-motions for summary judgment in this diversity action[2] concerning the payment terms of a commercial real estate lease.  The motions were filed under seal on one side by plaintiff Riser Foods Company (Riser) and cross-defendant Giant Eagle, Inc. (collectively Giant Eagle)[3] and on the other side by defendant/cross-claimant Shoregate Properties, LLC (Shoregate).[4]  The motions have been extensively briefed through

---

[1] The parties have consented to my exercise of jurisdiction.  ECF # 18.

[2] ECF # 1.

[3] ECF # 81.

[4] ECF # 80.

responses[5] and replies,[6] also filed under seal.  In addition, numerous motions to strike[7] exhibits and defenses have been filed, together with oppositions[8] and replies.[9]  There is also pending a motion for sanctions arising out of the discovery process,[10] to which a response has been filed.[11]  The parties have participated in oral argument concerning the motions for summary judgment.[12]  A bench trial date has been set.[13]

Therefore, on the Rule 56 record before me and for the reasons that follow:

- Shoregate's motion will be partially granted insofar as it seeks summary judgment that the terms of parties' lease are unambiguous as a matter of law.

- Giant Eagle's motion will be partially granted insofar as it seeks summary judgment on Shoregate's claim that it has bona fide purchaser status as a defense to reformation.

---

[5] ECF # 82 (Shoregate's response); ECF # 84 (Giant Eagle's response).

[6] ECF # 89 (Shoregate's reply); ECF # 90 (Giant Eagle's reply).

[7] ECF # 83 (Shoregate's first motion to strike); ECF # 88 (Shoregate's second motion to strike); ECF # 97 (Shoregate's third motion to strike).  *See also*, ECF # 100 (Giant Eagle's "response" to Shoregate's submission of demonstrative evidence (ECF # 98)).

[8] ECF # 86 (Giant Eagle's opposition first motion to strike); ECF # 91 (Giant Eagle's opposition to second motion to strike); ECF # 99 (Giant Eagle's opposition to second motion to strike).

[9] ECF # 87 (Shoregate's reply to first motion); ECF # 92 (Shoregate's reply); ECF # 101 (Shoregate's reply).  The motions to strike are addressed outside of this order.

[10] ECF # 66.

[11] ECF # 69.  The motion for sanctions is addressed by separate order.

[12] ECF # 96.

[13] ECF # 94.

- All other motions, in whole or in part, will be denied.  Specifically, the motions as to reformation of the lease on ground of mutual mistake are denied, and that claim will be decided at trial.

- Accordingly, following this ruling on the summary judgment motions and subject to the applicable law as will be set forth below, trial will be limited to the sole question of whether, by clear and convincing evidence, it can be shown that there was a mutual mistake of fact between the original contracting parties at the time the lease was signed regarding the terms for paying percentage rent, thus permitting reformation of the lease.

## Facts

As stated, the matter here concerns a dispute over the terms of commercial real estate lease.  Despite extensive discovery and briefing that contest many factual issues, the relevant facts necessary to adjudicate the current motions are neither complex nor extensive.

Prior to 2004, Giant Eagle[14] was operating a grocery store at Shoregate, a suburban Cleveland shopping center, under terms of a lease entered into in 1977 and amended in 1987.[15]  Under the lease as amended, Giant Eagle paid the landlord – Shoregate Shopping Center, Ltd. ("RMS") – a fixed minimum rent up to a breakpoint, after which it would be liable for percentage rent.[16]

---

[14] As noted above, "Giant Eagle" here refers collectively to both Riser Foods and to Giant Eagle.

[15] ECF # 81 at 3.  For ease of reference, citation, where possible, will be made to the brief which cites to the portion of record.

[16] *Id.*

Beginning in 2003, Giant Eagle and RMS began discussing expansion and renovation of Giant Eagle's space as part of RMS's plan to update the entire shopping center.[17]  As might be expected, determining how to handle the cost of Giant Eagle's expansion within the terms of a new lease amendment was a subject of negotiations between Giant Eagle and RMS.[18]  While Giant Eagle's position in the present case is that both parties agreed on a percentage rent formula that was later mistakenly changed during the drafting process, it is not disputed that the amended lease, as drafted and actually signed in October, 2004, contains the following percentage rent provision:

> Section 1.1(I)  Percentage Rent  One percent (1%) of Adjusted Gross Sales, which Adjusted Gross Sales shall be reduced by the sum of (i) Base Rent for that Lease Year and (ii) the amortized amount of Tenant's Project Costs, with interest at the rate of 6.5% per year over the term of twenty (20) years.[19]

In 2006, a competing grocery chain in the area closed its stores, including in a location near to Giant Eagle's in the Shoregate shopping center.[20]  As a result of both Giant Eagle's

---

[17] Id.; ECF # 80-1 at 2.

[18] Id.

[19] Id. at 2-3.  Shoregate claims that "Adjusted Gross Sales" as used in the clause "which Adjusted Gross Sales shall be reduced by the sum of. . ." is total Adjusted Gross Sales as defined in Section 6.02 of the Lease Agreement.  (ECF # 80-2, at 7; DApp 20.)  Giant Eagle counters that "Adjusted Gross Sales" as used in the clause is one percent of Adjusted Gross Sales.  At the oral argument on the summary judgment motions, I presented counsel with two mathematical formulas representing the respective positions of Shoregate and Giant Eagle.  (Transcript of Oral Argument of June 8, 2011 ["Tr."] at 20, 22-23.)  Those formulas were displayed on a white board in the courtroom, and a photograph of the white board with the formulas was made an exhibit to the transcript.  (Tr. at 93.)  After review, counsel for both Shoregate and Giant Eagle agreed that the formulas accurately represented their respective positions.  (Tr. at 22, 23, 23-24.)

[20] Id. at 3.

renovation and expansion at the Shoregate Shopping Center, as well as the closing of a nearby competitor, Giant Eagle's sales at the Shoregate location increased significantly.[21] Notwithstanding this increase in sales, Giant Eagle prepared rent statements for RMS in 2006 and 2007 showing that no percentage rent was due for its store in the Shoregate Shopping Center.[22]  Although RMS never sought to collect percentage rent from Giant Eagle during these two years,[23] RMS apparently also believed such percentage rent was owed.[24]

In early 2007, RMS decided to sell the Shoregate Shopping Center.[25]  While Shoregate, the present defendant in this action, was negotiating to acquire the shopping center from RMS, it became aware of the Giant Eagle lease and of the potential issue of unpaid percentage rent.[26]  The parties exerted considerable energy in trying to establish in detail what Shoregate knew and when as to any claim against Giant Eagle for percentage rent.  It is not contested that approximately three months before the 2008 closing RMS told Shoregate in writing that a "potential lawsuit" against Giant Eagle existed based on Giant Eagle's "potential default" of the amended lease for not paying percentage rent.[27]  Similarly, although the parties have spent a great deal of effort arguing about motives and reasons, it

---

[21] *Id.*

[22] ECF # 81 at 10.

[23] *Id.* at 11.

[24] ECF # 82 at 4-5.

[25] ECF # 81 at 11.

[26] ECF # 82 at 5-6.

[27] ECF # 81 at 14.

is equally undisputed in the record that Shoregate closed on the purchase of the shopping center after receiving the letter from RMS without directly discussing the issue of unpaid percentage rent with Giant Eagle.[28]

After Shoregate purchased the shopping center, it sent a notice to Giant Eagle demanding percentage rent for 2009.[29]  Giant Eagle refused and filed this suit.[30]

## Analysis

### A.    Standards of review

### 1.    *Summary judgment*

Summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[31]  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.[32]

---

[28] *Id*. at 15.

[29] ECF # 80 at 6.

[30] ECF # 1.

[31] Fed. R. Civ. P. 56(c).

[32] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)).

A fact is "material" only if its resolution will affect the outcome of the lawsuit.[33] Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.[34] The court will view the summary judgment motion "in the light most favorable to the party opposing the motion."[35]

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.[36] Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[37] Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.[38]

In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."[39] However, if the non-moving party faces a heightened burden of

---

[33] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[34] *Id.* at 252.

[35] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[36] *McDonald v. Petree*, 409 F.3d 724, 727 (6th Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 322).

[37] *Leadbetter v. Gilley*, 385 F.3d 683, 689 (6th Cir. 2004) (quoting *Anderson*, 477 U.S. at 248-49).

[38] *Anderson*, 477 U.S. at 249-50 (citation omitted).

[39] *Id.* at 252.

proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard.[40]

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover.[41] The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury."[42] The text of Fed. R. Civ. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

"In other words, the movant can challenge the opposing party to 'put up or shut up' on a critical issue."[43]

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'"[44] Rule 56(e) also has certain, more specific requirements:

---

[40] *March v. Levine*, 249 F.3d 462, 471 (6th Cir. 2001).

[41] *Anderson*, 477 U.S. at 256.

[42] *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

[43] *BDT Prods. v. Lexmark Int'l*, 124 F. App'x 329, 331 (6th Cir. 2005).

[44] *Wiley v. United States*, 20 F.3d 222 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).

> [it] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.[45]

However, the district court may consider evidence not meeting this standard unless the opposing party affirmatively raises the issue of the defect.  The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.[46]

As a general matter, the judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law."[47]  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter.[48]  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[49]

In sum, proper summary judgment analysis entails:

---

[45] *Id.* at 225-26 (citations omitted).

[46] *Id.* at 226 (citations omitted).

[47] *Anderson*, 477 U.S. at 248.

[48] *Id.* at 249.

[49] *Id.*

the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[50]

## 2.    *Diversity jurisdiction*

The Sixth Circuit has stated the well-known rubric for adjudicating diversity cases as follows:

> The task of this court, sitting in diversity, is to apply the same law as would be applied by the [Ohio] state courts.  Where a state's highest court has spoken to an issue, we are bound by that decision unless we are convinced that the high court would overrule it if confronted with facts similar to those before us.  Moreover, where a state appellate court has resolved an issue to which the high court has not spoken, "we will normally treat [those] decisions ... as authoritative absent a strong showing that the state's highest court would decide the issue differently."  More recently we explained that an intermediate appellate decision, while lacking the controlling force of a decision of a state court of last resort, does serve as "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  We may refuse to follow intermediate appellate court decisions where we are persuaded that they fail to reflect state law correctly, but "we should not reject a state rule just because it was not announced by the highest court of the state," even if we believe that the rule is "unsound."[51]

"Other persuasive data" which could persuade a federal diversity court include the state's supreme court dicta, restatements of law, law review commentaries, and the majority rule among other states.[52]  Moreover, in considering how a state supreme court would decide an issue, "[a] federal court in a diversity case is not free to engraft onto ... state rules

---

[50] *Id.* at 250.

[51] *Ziebart Int'l Corp. v. CNA Ins. Cos.*, 78 F.3d 245, 250 (6th Cir.1996) (internal citations omitted).

[52] *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995).

exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits."[53]

## B.    Application of standards

### 1.    *As a matter of Ohio law, the percentage rent provision in the lease is not ambiguous and so is enforceable, subject to any subsequent findings.*

Giant Eagle originally asserted a declaratory judgment claim in its initial complaint that the percentage rent provision of the lease was ambiguous and should be interpreted in accordance with the parties' mutual intent.[54] Giant Eagle then moved to dismiss this claim,[55] and the Court granted that motion.[56]  In so doing, I note that granting Giant Eagle's motion did not affect Shoregate's motion for judgment on the pleadings[57] as to that portion of its counterclaim which sought a declaratory judgment that the percentage rent provision of the lease is unambiguous and so enforceable against Giant Eagle.[58]

Subsequent to the foregoing actions, Shoregate reiterated its claim that the lease provision at issue is unambiguous in its motion for summary judgment.[59]  In like fashion,

---

[53] *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997) (internal citations omitted).

[54] ECF # 1 at ¶¶ 50-53.

[55] ECF # 49.

[56] ECF # 52.

[57] ECF # 50.

[58] ECF # 6, Counterclaim at ¶¶ 9-12.

[59] ECF # 80 at 9.

Giant Eagle has repeatedly asserted in its summary judgment briefs that the percentage rent provision is ambiguous because it was subject to different interpretations by the parties.[60]

Consequently, the issue is now properly before me as to whether the relevant lease provision for percentage rent is ambiguous.

Ohio law is well-settled that interpretation of a written agreement is a matter of law for the court.[61]  To that end, common words in an agreement are to be given their plain and ordinary meaning.[62]  Ohio law further states that a contract will be deemed unambiguous as a matter of law if it can be given definite legal meaning.[63]  Thus, if a contract is determined to be unambiguous, and so by definition found to be capable of being given clear legal meaning, the rights and obligations of the parties are then to be determined solely by the language of the agreement.[64]  A court must not create a new contract purportedly grounded on an alleged intent not expressed therein.[65]  Stated differently, Ohio law plainly teaches that a court must not rewrite an unambiguous contract to provide for a supposedly more equitable

---

[60] ECF # 99 at 4.  Noting that "Giant Eagle has repeatedly raised the ambiguity defense at both the pleading and summary judgment stages of the litigation ...."

[61] *Latina v. Woodpath Dev. Co*., 57 Ohio St. 3d 212, 214, 567 N.E.2d 262 (1991).

[62] *Shifrin v. Forest City Enters.*, 64 Ohio St. 3d 635, 638, 597 N.E.2d 499, 501 (1992).

[63] *Cincinnati Ins. Co. v. CPS Holdings*, 115 Ohio St. 3d 306, 308, 875 N.E.2d 31, 34 (2007).

[64] *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St. 3d 107, 108, 642 N.E.2d 684, 686 (1995).

[65] *Shifrin*, 64 Ohio St. 3d at 638, 597 N.E.2d at 502.

result.   As the Ohio Supreme Court concluded in *Aultman Hospital Association v. Community Mutual Insurance Co.*:[66]

> It is not the responsibility or function of this court to rewrite the parties' contract to provide for [relief from an unforeseen consequence to one party]. Where a contract is plain and unambiguous as herein, it does not become ambiguous by reason of the fact that its operation may work a hardship on one of the parties.[67]

In the case here, both parties concede, and uncontroverted evidence fully supports that: (a) the percentage rent clause of the lease was expressly negotiated between the parties, (b) the language of that provision was specifically reviewed and modified by counsel during the drafting process,[68] and (c) this reviewed and modified clause was then included in the lease that was actually signed.   It is also undeniable in the record that the context for the above-cited actions included contracting parties that were sophisticated and experienced in commercial real estate, employing equally sophisticated and experienced counsel.   This is not a case, in other words, of a first-time home apartment renter being confronted with a lease prepared by the landlord containing unfamiliar concepts and language.   As such, the holding in the syllabus of *Aultman Hospital* provides the rule of decision here:

> Where the parties following negotiation make mutual promises which are thereafter integrated into an unambiguous contract duly executed by them,

---

[66] *Aultman Hosp. Assn. v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 544 N.E.2d 920 (1989).

[67] *Id.*, 46 Ohio St. 3d at 54-55, 544 N.E.2d at 924 (citation omitted).

[68] *See*, ECF # 80 at 2, 14-15, 21.

courts will not give the contract a construction other than what the plain language of the contract provides.[69]

In examining that clause under the Ohio rubric stated above, as well as in light of the Ohio authority previously cited, I find first that the terms employed, when not defined specifically elsewhere in the document, are common words with plain meaning.  Further, I find that the percentage rent clause as worded in the document can be given a definite legal meaning, as it sets forth a clear, specific method of arriving at percentage rent owed under the lease.  Giant Eagle would have the Court interpret the language at issue to read "One percent (1%) of Adjusted Gross Sales, which [one percent of] Adjusted Gross Sales. . . ." To do so would require me to read into the language at issue words not placed there by the parties.  Without those words the plain and ordinary meaning of the language favors Shoregate's reading of the term.  The Court will not rewrite the contract to make it conform to Giant Eagle's reading, absent reformation for mutual mistake.

Accordingly, I find that this clause is unambiguous as a matter of Ohio law, and so, absent any additional findings requiring a different result, such an unambiguous contractual provision is enforceable by Shoregate against Giant Eagle regardless of whether the effect of enforcement would work a hardship on Giant Eagle.  Thus, as mentioned above, to the extent Shoregate's motion for summary judgment seeks a finding that this clause is unambiguous and so enforceable, the motion is granted; that grant, however, being subject to any limitations on enforceability following from any subsequent determinations.

---

[69] *Aultman Hosp.*, 46 Ohio St. 3d at 51, 544 N.E.2d at 921 (syllabus).

2.      *As a matter of Ohio law, Shoregate is not a bona fide purchaser for value (BFP).*

Ohio law provides that "a bona fide purchaser is a purchaser who takes in good faith, for value, and without actual or constructive knowledge of any defect."[70]  As to notice of adverse claims or defects, a party will be deemed to have constructive notice of an adverse claim if that party "has knowledge of facts that would induce a prudent person to make an inquiry by which [that party] would have or could have obtained knowledge of the adverse claim."[71]  Specifically, "Ohio courts have consistently held that [o]ne having notice of facts that would put a prudent man on inquiry is chargeable with knowledge of other facts he might have discovered by diligent inquiry.  Whatever notice is enough to excite the attention of a prudent man and put him on his guard is notice of everything to which such inquiry might have led."[72]

---

[70] *In re Cleary*, 2010 WL 2649949, at *3 (Bkrtcy. N.D. Ohio June 1, 2010) (internal quotations omitted) (citations omitted).

[71] *Wayne Bldg. & Loan Co. of Wooster v. Yarborough*, 11 Ohio St. 2d 195, 202, 228 N.E.2d 841, 847 (1967).

[72] *Tonito's, Inc. v. S&J Enters.*, 2010 WL 727977, at *3 (Ohio Ct. App. March 4, 2010) (citation omitted); *see also*, *Thames v. Asia's Janitorial Serv.*, 81 Ohio App. 3d 579, 587-88, 611 N.E.2d 948, 953-54 (Ohio Ct. App. June 30, 1992).  *Thames* includes a helpful review of constructive notice requirements in Ohio law, including a discussion of *Tiller v. Hilton*, 19 Ohio St. 3d 66, 68, 482 N.E.2d 946, 949 (1985), which case is cited by Shoregate (ECF # 82 at 14-15).

In brief, *Thames* finds that Ohio cases on constructive knowledge relative to bona fide purchasers fall into two broad categories:  (1) those arising under an "equitable" rule where the purchaser will be charged with constructive knowledge of a prior adverse interest when such purchaser has knowledge of facts that would induce a prudent person to make inquiry whereby he could or would have discovered the prior adverse claim; and (2) those arising under the recording statute (Ohio Rev. Code § 5301.25(A)) where the record itself serves as constructive knowledge as to the contents of a recorded instruments.  *Thames* suggests that the equitable rule applies in the absence of the recording statute being applicable.

Moreover, whether a purchaser is a BFP is determined at the time the purchase is

consummated, or at the latest, at the time of payment.[73]  In addition, establishing the

────────────────────

As an example of where the equitable constructive notice rules apply and the recording statute does not, *Thames* cites to the Ohio Supreme Court decision in *Wayne Bldg. & Loan Co.*  There, a developer told a bank lender with whom the developer was seeking to make a mortgage that a home under construction on land the developer owned and was offering as collateral for the mortgage had been sold to another.  That sales contract, although creating an equitable vendee's lien in favor of the buyer, was non-recordable as a mere executory contract and so was not in the chain of title at the time the bank considered making the mortgage.  The bank, on this record and with knowledge from the developer about the contract, made the mortgage loan and then claimed that its mortgage rights were as a bona fide purchaser and superior to those of the buyer under the sales contract.  The bank claimed it could not be charged with constructive knowledge of the sales contract because it was not present in chain of title.

The Ohio Supreme Court disagreed, finding that the bank could be charged with constructive knowledge of the non-recorded contract under the "equitable" rule.  The Ohio Supreme Court concluded:  "A bank loaning money on property for the purpose of constructing a house thereon, and being informed that there was an outstanding contract for sale of such property upon completion, would be on inquiry as to the extent of any already existing interest of a purchaser under such contract, and would take a mortgage on the property subject to the equities of the purchaser."  *Wayne Bldg. & Loan Co.*, 11 Ohio St. 2d at 202-03, 228 N.E.2d at 847.  Moreover, the *Wayne Bldg. & Loan Co.* decision also observed that "[f]or notice of an outstanding equitable interest to exist, it is not necessary that a person have knowledge of ... the extent of the interest, but merely that there is such an interest."  *Id.*

Because the situation here is analogous to that in *Wayne Bldg. & Loan Co.*, Shoregate's claim to be a BFP without constructive knowledge of Giant Eagle's claim regarding percentage rent is properly analyzed under the "equitable" rule and not the rule applicable under the recording statute.  Specifically, although the lease here is subject to being recorded under the statute and so Shoregate would thereby have constructive knowledge of the contents of the lease, the claim of a mutual mistake is not discoverable from the mere recorded contents of the lease.  Like the bank being informed of the executory sales contract in *Wayne Bldg & Loan Co.*, if Shoregate were actually informed of issues concerning Giant Eagle's payment of percentage rent prior to closing on the sale, it would, as the Ohio Supreme Court said of the bank, thus be on inquiry as to an existing adverse interest to enforcement of the lease and so would take the lease subject to that interest.

[73] *Tonito's*, 2010 WL 727977, at *4 (citation omitted).

-16-

individual elements needed to qualify as a BFP involves questions of fact.[74]  To that end, as a general rule a party seeking the status of a BFP has the burden of proof on that issue.[75]  However, where reformation of a contract is sought on the grounds of mutual mistake, "the burden of proving that the subsequent purchaser had notice of the mistake at the time he became a purchaser rests upon the litigant seeking the reformation."[76]

Here, as to the elements of establishing Shoregate's status as a BFP, there is no dispute that Shoregate acquired its interest in the lease for value.[77]  Accordingly, the critical issue here is whether it did so in good faith without actual or constructive knowledge of Giant Eagle's claim that the percentage rent provision, as written, was a mutual mistake.

Understood this way, and on the Rule 56 record here, there is no question but that, at the time it acquired its right under the lease, Shoregate did have actual or constructive knowledge that there was at least a potential dispute with Giant Eagle concerning payment

---

[74] *See*, *Howley v. Wythe Parish Homeowner's Ass'n*, 1991 WL 228708, at *4 (Ohio App. 2d Dist. Oct. 2, 1991).

[75] *Antill v. Antill*, 1984 WL 3504, at *4 (Ohio Ct. App. June 4, 1984) (citation omitted).

[76] *Guenther v. Downtown Mercury*, 105 Ohio App. 125, 129-30, 151 N.E.2d 749, 752 (Ohio Ct. App. 1958) (citing 45 Am. Jur. § 112 at 649).

[77] That said, I note that Giant Eagle attempts to argue that the relevant purchase by Shoregate was of some "potential lawsuit" against Giant Eagle, not of the shopping center and the lease.  *See*, ECF # 80 at 26.  Under that framing of the matter, Giant Eagle then asserts that no value was paid for any potential suit because Shoregate ultimately bought the shopping center without assigning any value to a potential suit.  *Id.*  Whatever merit this argument may have as a lawyer's debating point, it is clear that Shoregate's status as a BFP relates to it having purchased the shopping center, together with rights under the lease to obtain rent from tenants of the center such as Giant Eagle.  As to that purchase, there is no factual dispute that Shoregate paid $17.3 million.  *See*, ECF # 82 at 26.

of percentage rent.  Most significantly, there is no factual dispute that prior to closing Shoregate received written notice from RMS that it had a "potential lawsuit" against Giant Eagle for "unpaid percentage rent," and that "[r]egarding the potential default [by Giant Eagle], you [Shoregate] have been made aware of the issues related to Giant Eagle and percentage rent."[78]

For its part, Shoregate raises multiple arguments against assigning any weight to the fact that it received this letter.

First, it argues that because the letter did not explicitly say that there was a mistake in the lease language or state that percentage rent was not owed, it, in essence, provided no notice of such things to Shoregate.[79]  Shoregate attempts to claim that notice to a BFP must be highly exact and technically specific.  Of course, as stated above, the law in Ohio is that notice may be constructive and merely "enough to excite the attention of a prudent man and put him on his guard," such that a party whose attention has been excited then makes inquiry and becomes responsible for "everything to which such inquiry might have led."[80]  Indeed, as Ohio courts have stated, a subsequent purchaser who desires the status of a BFP cannot "close its eyes to the real situation," and in so doing fail to ascertain "the all important facts"

---

[78] ECF # 81 at 14, quoting letter.

[79] ECF # 82 at 13.

[80] *Tonito's*, 2010 WL 727977, at *7.

involved in the purchase, and the consequences flowing from those facts.[81] Thus, as a matter of law, this argument by Shoregate fails.

Next, Shoregate asserts that because every inquiry about percentage rent it made to the landlord, RMS, received the response that percentage rent was owed – a response supported by a third-party legal opinion to that effect that percentage rent was owed, it had no contrary indication that a mistake existed in the language of the lease.[82] Again, such a view misapprehends the nature of constructive notice manifest in the February, 2008, letter from RMS directly informing Shoregate of "issues related to Giant Eagle and percentage rent." Shoregate also misconstrues the law as to the consequences of such notice, which, as stated above, imputes knowledge of all facts that could or would have been discovered by a prudent man who made inquiry after being "put on his guard" about a potential adverse interest.

Shoregate's view is also certainly not the law as stated by the Ohio Supreme Court in *Wayne Building & Loan Co.*, where it held that, for notice of an outstanding equitable interest to exist, it not necessary that a person have specific knowledge of the precise interest, but that the person "merely [know] that there is such an interest."[83] Plainly, the letter from RMS directly conveyed that information.

---

[81] *Id*., quoting *The Shaker Corlett Land Co. v. Cleveland*, 139 Ohio St. 536, 543, 41 N.E.2d 243, 247 (1942).

[82] ECF # 82 at 13-14.

[83] *Wayne Bldg. & Loan Co*., 11 Ohio St. 2d at 203, 228 N.E.2d at 847-48.

Shoregate also attempts to argue that constructive notice only covers those things that have been recorded.[84]  As noted above, that statement is only partially correct as to Ohio law. As detailed earlier, a line of cases in Ohio concerning a limitation on constructive notice holds that such notice exists as to the content of recorded instruments.  However, as was explained above, the present situation arises under another line of cases, stemming from the Ohio Supreme Court's decisions in *The Shaker Corlett Land Company v. Cleveland* and *Wayne Building & Loan Co.*, that apply the equitable rule that finds constructive knowledge in situations, like here, where a prudent person has knowledge of facts which, when investigated, could or would reveal an adverse claim.

Finally, Shoregate argues that RMS precluded it from directly contacting Giant Eagle[85] and that Giant Eagle should be precluded from raising any objections to Shoregate's BFP status by reason of the estoppel certificates filed by Giant Eagle in connection with the sale.[86]  I note initially that both of these arguments, though not persuasive, simply assert reasons for not making inquiry of Giant Eagle after receiving the information prior to closing as to issues regarding percentage rent.  The arguments are considered in turn.

First, as to allegedly being prohibited by RMS from speaking directly to Giant Eagle, in circumstances where a prudent buyer has been put on notice of a potential adverse interest,

---

[84] ECF # 82 at 15.

[85] ECF # 82 at 27.

[86] ECF # 80 at 24.

the law imposes a duty to make inquiry or later lose the ability to claim status as a BFP.[87]

Here, Shoregate was informed of a potential adverse interest, had a duty to inquire, and did

not.[88]  Thus, as the court held in *Howley v. Whythe Parish Homeowners Association*, that

failure to do what the law required – *i.e.*, to inquire when provided constructive notice of an

adverse claim before closing on the sale –  now precludes a finding that Shoregate was a

BFP.[89]

Next, as to the estoppel certificates, Giant Eagle correctly notes that the certificates

themselves provide that the representations contained therein act as a waiver only with

respect to a BFP "without knowledge of facts contrary to those contained" in the

certificates.[90]  Since, as set forth above, Shoregate is not a BFP, anything in the estoppel

certificates cannot be used by Shoregate to overturn that status.

Accordingly, for the reasons given above, to the extent Giant Eagle seeks summary

judgment on the claim that Shoregate is not a BFP,[91] that element of the motion is granted.

---

[87] *Howley v. Wythe Parish Homeowners Ass'n*, 1991 WL 228708, at *4 (Ohio Ct. App. 1991).

[88] ECF # 81 at 15 (also noting that Shoregate "contacted Giant Eagle on multiple occasions regarding a number of other lease related matters [between the February 8 letter and closing], but never bothered to raise the percentage rent issue").

[89] *See*, *Howley*, 1991 WL 228708, at *4.

[90] ECF # 84 at 14.

[91] ECF # 81 at 25-28.

Similarly, to the extent Shoregate's motion for summary judgment sought recognition of its status as a BFP,[92] that portion of the motion is denied.

**3.**     ***A genuine issue of fact exists for trial as to whether a mutual mistake occurred concerning the percentage rent provision of the lease, such as would permit reformation of that portion of the lease to reflect the parties' original agreement.***

Since the claim of mutual mistake with corresponding reformation of the contract is now the heart of Giant Eagle's case, it is not surprising that this issue was vigorously argued and briefed in the motions for summary judgement.  I will first set forth the applicable law regarding reforming contracts for mutual mistake, then the parties' positions, and finally my disposition.

Ohio's law as to when a mutual mistake exists in a contract and any rights to reformation of such a contract was recently set forth by District Judge Gwin of this Court in *ArcelorMittal Cleveland, Inc. v. Jewell Coke Company, L.P.*[93]

Initially, *ArcelorMittal* found that Ohio law, in accord with the Restatement, defines a mutual mistake in a contract as "where the parties to a contract reach an agreement, but then fail to correctly reduce that agreement to writing."[94]  A mutual mistake may be grounds for rescission of the contract or reformation.[95]  However, where the mutual mistake is one of

---

[92] ECF # 80 at 17-19.

[93] *ArcelorMittal Cleveland, Inc. v. Jewel Coke Co., L.P.*, 750 F. Supp. 2d 839 (N.D. Ohio 2010).

[94] *Id*. at 846 (citation omitted).

[95] *Id*. at 847 (citation omitted).

expression, as in the case of a scrivener's error, rescission is generally only appropriate where reformation will not protect the interests of the parties.[96]

To succeed on a claim of mutual mistake in Ohio, "a court must find by clear and convincing evidence that the parties were mutually mistaken regarding the contents of the contract."[97] That is, it must be established that "both parties have an identical intention as to the terms to be employed in a proposed written ... contract ..., and a writing executed by them is materially at variance with that intention...."[98] To determine the parties' intent, the court "must examine the parties' conduct, any course of dealings between them and the method of handling the specific transaction in question."[99] A contract need not be ambiguous to be reformed for mutual mistake.[100] Reformation, however, may be barred in the event that a party acted with "something more than ordinary negligence" in failing to notice the defect.[101] Generally, Ohio courts will not reform a contract in the case of unilateral mistake.[102]

---

[96] *Id.*

[97] *Id.* (citations omitted).

[98] *Id.* at n.5 (quoting "Restatement (First) of Contracts § 504, Reformation for Mutual Mistake.").

[99] *Harvey v. Harvey*, 91 Ohio App. 3d 404, 410, 632 N.E.2d 956, 960 (Ohio Ct. App. Nov. 3, 1993) (citation omitted).

[100] *Cuthbert v. Trucklease Corp.*, 2004 WL 1879023, at *7 (Ohio Ct. App. Aug. 24, 2004) (citation omitted).

[101] *ArcelorMittal*, 450 F. Supp. 2d. at 846 (citations omitted).

[102] *Id.* at 848 (citation omitted).

-23-

Initially, before considering the issue of whether a mutual mistake has been shown to have occurred in this case, I must address the predicate inquiry of whether Giant Eagle's actions in failing to identify the alleged error during the drafting process was "something more than ordinary negligence" that now precludes it from reforming the contract.

The Rule 56 record is clear, and the parties agree, that the current language on percentage rent was originally drafted by counsel for Shoregate and transmitted to counsel for Giant Eagle as part of the drafting process for the lease.[103]  There is no evidence that this language was transmitted to Giant Eagle with any characterization as to how it changed the preceding draft language.  Indeed, the reviewing attorney for Giant Eagle[104] has testified that she believed the language was susceptible to different meanings and so did not identify the change as being material.[105]

As noted, Ohio law states that "ordinary negligence" will not bar reformation of a contract for mutual mistake, but that only "gross negligence" or a failure to act in good faith on the part of the entity seeking reformation will preclude such relief.[106]  Moreover, once the relevant facts are established, the question of whether those actions are negligence such as would bar reformation is a matter of law.[107]

---

[103] *See*, ECF # 81 at 8-9.

[104] Drafting counsel for Shoregate is now deceased and so was never deposed.

[105] *Id.*

[106] *ArcelorMittal*, 750 F. Supp. 2d at 845-46 (citations omitted).

[107] *Id.* at 846.

On this record, I find that Giant Eagle is not barred from seeking reformation of the lease because it acted with more than ordinary negligence in participating in the drafting of the lease.  In particular, while the unrebutted facts here show Giant Eagle was negligent in incorporating a critical payment formula into the lease in terms drafted by Shoregate on the assumption that unambiguous words unfavorable to its own position could still be capable of a different meaning, such action was not "grossly" negligent or a display of bad faith.

Accordingly, to prevail on its summary judgment motion, Giant Eagle must here show that after making all inferences in favor of Shoregate, there is no issue of material fact in dispute and that, by clear and convincing evidence, Giant Eagle and RMS had "an identical intention" regarding the terms of the percentage lease provision so that the lease, as written, is "materially at variance with that intention."  For the reasons that follow, after examining the Rule 56 record for the parties' conduct, the course of dealing between them, and the "method of handling the specific transaction in question,"[108] I find Giant Eagle has not met that burden, and so its motion for summary judgment should be denied in this regard.

Specifically, although the Rule 56 record contains a record of the parties' dealing with each other after the lease was signed, such a record is inconclusive of what they each meant in executing the lease.  Moreover, despite extensive testimony from Giant Eagle as to what it believes was intended at the time by the parties as relates to percentage rent,[109] the RMS testimony is thinner and murkier as to what the "exact intention" was concerning this clause

---

[108] *Harvey*, 91 Ohio App. 2d at 410, 632 N.E.2d at 960.

[109] ECF # 81 at 4-7.

by the responsible drafting parties.[110]  Indeed, Shoregate's evidence suggests that it is not even clear who were the specific, responsible persons whose "intention" as to the lease terms must now be ascertained.[111]

Thus, mindful that a court may not weigh evidence in adjudicating a motion for summary judgment, and further mindful that the opposing party is entitled to the benefit of all inferences in its favor, I cannot conclude that Giant Eagle has met its burden of showing by clear and convincing evidence that a mutual mistake was made concerning percentage rent such that a reformation of the contract could be accomplished.[112]  Therefore, Giant Eagle's motion in this respect is denied.

## Conclusion

For the foregoing reasons, the cross-motions for summary judgment are denied in part and granted in part as set forth above.  Trial will accordingly proceed on the sole issue of whether a mutual mistake occurred in the contract as to the percentage rent provision such as would permit a reformation of the contract to reflect the parties' original intention.

IT IS SO ORDERED.

Dated:   September 7, 2011                          s/ William H. Baughman, Jr.
                                                   United States Magistrate Judge

---

[110] *See*, *e.g.*, ECF # 82 at 17-19.

[111] *See*, ECF # 82 at 18-19.

[112] In that regard, I am also particularly aware that reformation does not mean creating a new contract to provide for some, allegedly more equitable result. *Aultman Hosp.*, 46 Ohio St. 3d at 54-55.